# Richmond.

## Virginia & Southwestern Railway Co. v. Bailey.

### November 23, 1904.

1. EVIDENCE—*Improper Exclusion—Harmless Error.*—The error in improperly permitting a witness to answer a question which was objected to is harmless, where other evidence on the identical point was subsequently received without objection.

2. EVIDENCE—*Improper Exclusion—Instruction—Harmless Error.*—The exclusion of evidence tending to show that it was not the duty of a conductor to do a particular act cannot be prejudicial when followed by an instruction which states that, as a matter of law, no such duty devolved upon him.

3. EVIDENCE—*Railroads—Coupling Cars—Speed.*—Where the gravamen of the charge of negligence on the part of a conductor in making a coupling is that he permitted the engine to approach, with a dangerous speed, the cars to which the coupling was to be made, and that it was his duty to know, not the exact position of those cars, but to have such a reasonable knowledge of their situation as would have enabled him to make the coupling with safety, it is not error to refuse to permit a witness to answer the question, "Would it or not be the duty of the conductor to know the exact spot at which the cars had been left to which he was going back to couple," as a categorical answer would have been misleading.

4. RAILROADS—*Master and Servant—Risks Assumed by Fireman.*—A fireman on a locomotive engine only assumes the ordinary and usual risks incident to such an employment.

5. MASTER AND SERVANT—*Railroads—Conductor—Superior Officer.*—The conductor of a freight train is a superior officer to the residue of his crew, and they are subject to his orders, and have the right to assume that he will discharge his duties in a careful manner, and in the usual and ordinary way.

6. PERSONAL INJURY—*Damages—Expectancy—Mortality Tables.*—In estimating the damages for a permanent personal injury the jury may

consider the physical and mental suffering of the plaintiff, loss of wages while unable to work in consequence of the injury, inability to follow such a calling or business as he could otherwise have followed, and expenses incurred for medical and surgical attention, medicines, nursing, etc. They may also take into consideration the plaintiff's probable duration of life, and to show this, standard mortality tables are usually esteemed the safest guides upon the subject, to be taken and weighed along with other facts and circumstances applicable to the expectation of the particular life under consideration.

7. RAILROADS—*Conductor—Vice-Principal—Injury to Fireman—Concurrent Negligence of Conductor and Brakeman.*—The conductor of a railroad train is a vice-principal of his crew, and for an injury inflicted on a fireman of his train, in consequence of the concurrent negligence of the conductor and of a brakeman, the company is responsible as though it alone were guilty.

8. ARREST OF JUDGMENT—*Failure to Object to Evidence—Complete Defense—Correct Verdict.*—Although a declaration be less specific in its allegations of negligence than it should have been, and the evidence was permitted to go beyond the averments of the declaration, still where there was no demurrer to the declaration, no objection to the evidence when offered, and no motion to strike it out after it was received, and the case has proceeded to a verdict against the defendant, and it is manifest that the defendant has presented his whole case to the jury, and has suffered no prejudice, and that the verdict is in accordance with the very right of the case, a motion in arrest of judgment for failure of the declaration to state a case of actionable negligence should be over-ruled.

Error to a judgment of the Corporation Court of the city of Bristol, in an action of trespass on the case, wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Affirmed.*

The facts of the case sufficiently appear in the opinion of the court. After the evidence was all in, the court gave the following instructions on the motion of the defendant in error, and over the objection of the plaintiff in error:

*Instruction for Plaintiff, No. 1.—Given.*

"The court instructs the jury that when a person enters the employ of a railroad company as fireman, he only assumes the ordinary and usual risks that are incident to such employment."

*Instruction for Plaintiff, No. 2.—Given.*

"The court further instructs the jury that the conductor in charge of the train upon which plaintiff was at the time he was injured was a superior officer, therefore all other employees on said train were subject to his orders."

*Instruction for Plaintiff, No. 3.—Given.*

"The court instructs the jury that if they should find for the plaintiff, they may, in estimating damages, take into consideration the following:   The physical and mental suffering of plaintiff received from his injury, his loss of wages for the time during which he was prevented by said injuries from working; proper compensation for his being unable because of said injuries to follow such a calling or business as he could otherwise have followed, and for moneys expended by plaintiff, or for which he is obligated or indebted for medical and surgical attention, medicines, nursing, etc.

*Instruction for Plaintiff, No. 4.—Given.*

"The court further instructs the jury that if they find for the plaintiff, they may, in estimating his damages if they believe his injuries permanent, also take into consideration the plaintiff's probable duration of life, and to show this they may take into consideration the standard mortality tables as showing the probable duration of plaintiff's life under all proof in this case, and

they may also consider the fact that plaintiff is engaged in railroad service, a more hazardous occupation than ordinary vocation of life."

### Instruction for Plaintiff, No. 5.—Given.

"The court instructs the jury that the plaintiff had a right to presume that the conductor of defendant company would discharge his duties in a careful manner and in the usual and ordinary way."

The plaintiff in error asked for eight instructions. Numbers 1, 2, 3, 4, 6 and 7 were given as asked—number 8 was refused. The court also gave number 5 after having modified the same by inserting the word "solely" in the first paragraph thereof between the words "plaintiff resulted" and the words "from such failure," and by inserting the word "solely" in the second paragraph thereof after the words "complained of was" and before the words "the result of such failure." The instructions, as requested by plaintiff in error, were as follows, to-wit:

### Instruction for Defendant, No. 1.—Given.

"The court instructs the jury that negligence on the part of the defendant cannot be presumed in this case, that it must be shown by the plaintiff by preponderance of testimony. Otherwise the plaintiff cannot recover."

### Instruction for Defendant, No. 2.—Given.

"A servant entering the employment of a master assumes such risks as are ordinarily incident to the employment from causes open and obvious, the dangerous character of which he has had the opportunity to observe, and he must exercise reasonable care and caution for his own safety while engaged in the master's service."

### Instruction for Defendant, No. 3.—Given.

"The court instructs the jury that the burden of proving negligence is upon the plaintiff, and that negligence must be proved by affirmative evidence, which must show more than a probability of a negligent act, that a verdict cannot be found upon a mere conjecture, and that there must be affirmative and preponderating proof that the injury here sued for would not have occurred except for the negligent breach of some duty which the defendant owed to the plaintiff."

### Instruction for Defendant, No. 4.—Given.

"The court instructs the jury that if they should believe from the evidence that the injury complained of resulted to the plaintiff as a mere accident resulting from a misunderstanding of signal lights, and not resulting from negligence or fault on the part of the defendant or its conductor, they must find for the defendant, and this although they may believe the plaintiff also was free from fault."

### Instruction for Defendant, No. 5.

(Refused as asked—Modified as stated above and then given.)

"The court instructs the jury that if they believe from the evidence that it was the duty of W. R. Campbell, the brakeman, under the circumstances in this case, to have gone with his lantern to the end of the car to which the engine was going to couple and that he failed to go to the end of said car, and that the accident to plaintiff resulted from such failure of said brakeman to perform such duty, they will find for the defendant.

"And so, likewise, if they believe from the evidence that said brakeman could have prevented said accident by giving a signal

to the approaching train to slow down or stop, and that, under the circumstances in this case it was his duty to have given such signal and that he failed to give such signal and that the accident complained of was the result of such failure they will find for the defendant."

### *Instruction for Defendant, No. 6.—Given.*

"The jury are further instructed that the conductor in this case had the right to presume that his brakeman Campbell was acquainted with the usual and customary method of performing his duties, and it was not the duty of said conductor to give him special instructions with reference thereto."

### *Instruction for Defendant, No. 7.—Given.*

"The court further instructs the jury that although they may believe from the evidence that the defendant was guilty of negligence yet if they believe from the evidence that the plaintiff was also guilty of negligence, and that, but for the negligence of the latter, the accident would probably not have occurred, they will find for the defendant."

### *Instruction for Defendant, No. 8.—Refused.*

"The jury are further instructed that although they may believe from the evidence that it was the duty of conductor Brown to know the location of the cars that he was going back to couple to, and that he neglected this duty and did not know the location thereof, yet if they believe from the evidence that said conductor believed, and, under all the circumstances of this case, had the right to believe, that Campbell, the brakeman, would be, with his lantern, at the end of the car to which they expected to couple, and further believe that if said Campbell

had been at the end of said car with said lantern, the accident would not have occurred, they will find for the defendant.'"

The court also gave the following instruction of its own motion:

### Court's Instruction.

"The court instructs the jury that if they believe from the evidence that in attempting to make the coupling at the time of the accident the engine approached and struck the cars at a greater rate of speed than reasonably safe and proper, and that by reason thereof the plaintiff, without fault on his part, was thrown from his place and injured, and they shall further believe the accident was caused by the negligence of Conductor Brown, or by the concurrent negligence of Conductor Brown and Brakeman Campbell, they shall find for the plaintiff; and, on the other hand, if they believe from the evidence that the accident was caused solely by the negligence of Brakeman Campbell, he is a fellow servant of the plaintiff, and there can be no recovery."

After the verdict was rendered, the plaintiff in error moved in arrest of judgment because the declaration failed to state any case at all against the plaintiff in error. There was no demurrer to the declaration, but a bill of particulars was demanded and furnished. The declaration and bill of particulars were in the following words and figures, to-wit:

### "Declaration.

"In the Corporation Court of the City of Bristol, Va.

"D. H. Bailey, plaintiff, complains of the Virginia & Southwestern Railway Company, a corporation under the laws of Virginia, defendant, of a plea of trespass on the case, for this, to-

wit:—heretofore to-wit:—on or about the 16th day of April, 1903, said defendant owned and operated a railroad from the city of Bristol, Virginia, to Big Stone Gap, Wise county, Va., with its principal office at Bristol, Va. Said plaintiff was an employee and fireman of said defendant in the operation of its train on said road, and while engaged in his regular line of duty as fireman, on one of said defendant's engines, which had pulled a freight train from the city of Bristol, Va., to a station on said road at Clinchport, Va., en route to Big Stone Gap, Va., and when said engine was cut loose from the said freight train and taken some distance to do some switching, and it being between 9 and 10 o'clock at night, on a very dark and rainy night, and while said company was shifting cars off of the switch and on to the main track, and from said main track to said switch, there being at the said place on the main track a high trestle or bridge over Stock Creek, and there being a considerable curve on said bridge, and after part of the cars on said switch had been pulled out and put on to the main track, and part of the cars had been put back on to said switch, and while said engine was on said switch, it being some distance across to the main track where the cars to be shifted were then standing, the conductor in charge of said train and having control of the movement of the cars in shifting backward and forth from one track to the other ordered the brakeman to walk across form the switch to the cars then standing on the main track for the purpose of giving signals, &c., to the engineer and conductor, both of whom were on the engine and tender on which the plaintiff was.

"Then the conductor motioned the engineer forward from the switch track on to the main track, some distance above the switch, and after getting on the main track, the conductor then motioned the engineer back to couple the engine to the cars standing on the main track, and in obedience to the signals given by the conductor, the plaintiff being then and there in his

usual and proper place, and engaged in and about the discharge
of his duties as such fireman, and there being at the time no
lights or signals on the side of engine or cars on which plaintiff
was.   Plaintiff avers that the engineer ran back at the rate of
about ten miles per hour to couple to the cars standing on the
main line, which had been negligently left on said bridge, two
of which were flat cars loaded with pig iron, and which were in
front next to the tender of the engine on which plaintiff was,
and the tender of said engine running at the rate of speed afore-
said struck the front end of said cars so loaded with pig iron as
aforesaid with such great force and violence as to cause the said
plaintiff while he was so engaged in and about the discharge of
his regular and proper duties to be knocked out of his place in
said engine or cab and violently thrown over the ends of the
ties of said bridge, and falling a distance of about fifty feet into
the creek below, whereby he was permanently injured, having
received a concussion of the spine and other permanent injuries,
from which he suffered and has continued to suffer great physi-
cal pain and mental anguish and great pecuniary loss which
injuries, pain, mental anguish and pecuniary loss were received
and caused to said plaintiff by the careless, negligent, reckless
and wrongful act and conduct of the employees, servants and
agents of the defendant, and without any negligence on the
part of the said plaintiff.

"Plaintiff avers that it was the duty of the defendant to pro-
vide safe and suitable machinery, tools, implements, appliances
and furnishings with which to do said work; to provide a suffi-
cient force of competent, skillful and experienced employees to
man and control and operate said engine and cars, to provide
safe and suitable places to do the work required of its em-
ployees; to provide suitable and proper lights, signals, appli-
ances, and careful and competent employees for the purpose of
shifting said cars from said switch on to said track; and have

said cars, engine and tender managed, operated and controlled in a skillful and safe manner, and have said cars moved from the main track to the switch, and have said tender and engine coupled to said flat cars loaded with pig iron as aforesaid, in a skillful and safe manner so that plaintiff could discharge his duties as such fireman while said work was being done with safety to himself.

"And the plaintiff avers that said defendant negligently failed to provide safe and suitable machinery, tools and implements, appliances and furnishings with which to do said work; and negligently failed to provide safe and suitable places to safely do the work required of its employees; and negligently failed to provide a sufficient force of competent, skillful and experienced employees to man, control, and operate said engine and cars, and negligently failed to provide suitable and proper lights, signals and appliances, and careful and competent employees for the purpose of shifting said cars from said switch on to said track and from said track on to said switch; and negligently failed to have said cars, engine and tender managed, operated and controlled in a skillful and safe manner, and have said cars moved from the main track to the switch, and have said engine and tender coupled to said flat cars loaded with pig iron as aforesaid in a skillful and safe manner so that plaintiff could discharge his duties as such fireman while said work was being done with safety to himself, and that by reason of the said several breaches of duty on the part of the defendant, and the careless, reckless and negligent and wrongful acts and conduct of its employees in the manner of doing said work of shifting cars as aforesaid, the said tender and engine was suddenly, violently, negligently, unlawfully and wrongfully thrown against the end of the flat car, and plaintiff was knocked off and thrown out of his place in the cab or engine, sustaining the injuries complained of, and the pecuniary loss, as aforesaid, and also by

means of the premises aforesaid, plaintiff was obliged to lay out and expend, and did necessarily lay out and expend divers large sums of money in and about his being treated and nursed, because of injuries aforesaid in the way of doctor's bills, medicine and his being nursed to the amount of $600; and by reason of all of which the said plaintiff has sustained damages to the extent of twenty thousand ($20,000) dollars.

"And therefore, he brings his suit.

"PETERS & LAVINDER,

"W. F. RHEA,

"A. H. BLANCHARD, p. q."

"Order of September 8, 1903.

"D. H. Bailey,

  *v.*

"Virginia & Southwestern Railway Co.

"This day came the parties by their attorneys, and the plaintiff filed a bill of particulars of his complaint. Thereupon the defendant moved the court to continue the case, which motion the court doth grant, and said case is continued, and the defendant is required to file a bill of particulars of its defense.

"Bill of Particulars as Required by the Court.

"D. H. Bailey,

  *v.*

"Virginia & Southwestern Railway Co.

"This day came the plaintiff, by his attorneys, and filed this his bill of particulars pursuant to the order of the court in this case, and says that the grounds of complaint relied upon in this case are to-wit:

"That on or about the 16th day of April, 1903, said defendant owned and operated a railroad from the City of Bristol, Va., to

Big Stone Gap, Wise county, Va., with its principal offices at Bristol, Va. Said plaintiff was an employee and fireman of said defendant in the operation of its trains on said road, and while engaged in his regular line of duty as fireman, on one of said defendant's engines, which had pulled a freight train from the city of Bristol, Va., to a station on said road at Clinchport, Va., en route to Big Stone Gap, Va., and when said engine was cut loose from the freight train and taken some distance to do some switching, and it being between 9 and 10 o'clock at night on a very dark and rainy night, and while said company was shifting cars off of the switch and on to the main track, and from said main track to said switch; there being at the said place on the main track a high trestle or bridge over Stock Creek, and there being a considerable curve on said bridge, and after part of the cars on said switch had been pulled out and put on to the main track, and part of the cars had been put back on to said switch, and while said engine was on a switch, it being some distance across to the main track where the cars to be shifted were then standing, the conductor in charge of said train and having control of the movements of the cars in shifting backward and forth from one track to the other ordered the brakeman to walk across from the switch to the cars then standing on the main track for the purpose of seeing whether the cars standing on the main track and to which the engine and tender were to be coupled were properly coupled together so that the engine and tender could be coupled to said cars standing on the main track, for the purpose of moving said cars on to the switch track. Then the conductor motioned the engineer forward from the switch track on to the main track, some distance above the switch, and after getting on the main track, the conductor then motioned the engineer back to couple the engine to the cars standing on the main track, and in obedience to the signals given by the conductor, the plaintiff being then and there in his usual

and proper place and engaged in and about the discharge of his duties as such fireman, and there being at the time no lights or signals on the side of engine or cars on which plaintiff was.

"Plaintiff avers that the engineer ran back at the rate of about ten miles per hour to couple to the cars standing on the main line, which had been negligently left on said bridge, two of which were flat cars loaded with pig iron, and which were in front next to the tender of the engine on which plaintiff was, and the tender of said engine running at the rate of speed aforesaid, struck the front end of said cars so loaded with pig iron as aforesaid with such great force and violence as to cause the said plaintiff while he was so engaged in and about the discharge of his regular and proper duties·to be knocked out of his place in said engine or cab and violently thrown over the ends of the ties of said bridge, and falling a distance of about fifty feet into the creek below, whereby he was permanently injured, having received a concussion of the spine and other permanent injuries, from which he suffered and has continued to suffer great physical pain and mental anguish and great pecuniary loss, which injuries, pain, mental anguish and pecuniary loss were received and caused to said plaintiff by the careless, negligent, reckless and wrongful act and conduct of the employees, servants and agents of the defendant, in so negligently, violently and unlawfully running the engine and tender against the flat cars, and without any negligence on the part of the said plaintiff, and by failure of defendant as set forth in the declaration to provide skillful and suitable employees to run said engine and cars, and to provide and give suitable signals in shifting the cars from the main track to the switch and from the switch to the main track, and by reason of the negligent, careless and reckless manner in which said shifting was done by defendant, the said tender and engine was suddenly, violently negligently, unlawfully and wrongfully thrown against the end of the flat car

loaded with pig iron and by reason of which plaintiff was knocked off and thrown out of his place in the cab or engine, whereby he sustained the injuries complained of in the declaration."

*Bullitt & Kelly* and *D. D. Hull*, for the plaintiff in error.

*Peters & Lavinder*, *A. H. Blanchard* and *Wm. F. Rhea*, for the defendant in error.

KEITH, P., delivered the opinion of the court.

D. H. Bailey, the plaintiff in the court below, was a locomotive fireman in the freight-train service of the Virginia & Southwestern Railway Company. On the 16th day of April, 1903, the crew to which he belonged started from Bristol to Big Stone Gap, and arrived at Clinchport, an intermediate point, some time during the night of that day. At Clinchport the crew received orders to shift some cars which were standing on a siding. The engine and tender were accordingly cut loose from the train at the depot, and all of the crew except the fireman went with the engine to do the shifting.

The switch is situated several hundred yards west of the depot, and at the point of the switch there is a railroad bridge, on the main line, over Stock Creek. This bridge is 263 feet long; its eastern end is about 777 feet from the depot, and its western end is 482 feet from the point of the switch. The total distance from the depot to the switch is 1522 feet. The bridge is about 28 feet hight at its highest point. Upon this switch there was a train of cars, about twenty in number. The purpose of the switching to be done by the crew was to change the position of these cars so as to place one of them which stood near the west end of the cars on the switch track, to the rear, or east end, in position to be loaded. To accomplish this change

of position, all the cars on the switch had to be moved and placed on the main line near the depot, and then replaced on the siding.

After placing the car, which was to be set on the rear end of the switch, next to the engine, the crew proceeded to remove the remaining cars from the switch, and put them down on the main line below the point of the switch. From the point of the switch on the main line to the other end of the switch was a down grade, so that all of the cars could not be brought out at once, but several pulls had to be taken at them. At first about eight or ten cars were brought out and placed on the main line. Conductor Brown was actively engaged taking the full part of a trainman while this was being done, and it appears that he attended to opening and shutting the switch, while Brakeman Campbell rode on the cars and uncoupled them on the main line, cutting them off on this first pull between the car next to the engine, and the residue of the cars. Then holding on to the car next to the engine, they went back into the switch and brought out another set of cars, which were pushed down on the main line below the switch, Campbell again cutting them off so as to leave the car next to the engine still coupled thereto. When they had cleared the switch, they dropped the car which they had been holding on to down on the far end of the switch track, and then proceeded to replace the other cars back on the siding. After they had replaced all the cars except those first brought out, which would consequently be the last put in, just before starting back with the engine and tender from the switch track for this last pull from the main line, a conversation occurred between Brown and Campbell, as to the substance of which there is a difference between them, and which was not heard by the engineer or fireman. Brown says that he either told Campbell, or that Campbell suggested to him, that he, Campbell, would go across to the cars on the main line if Brown

would take the engine around, and that the two reached this understanding. Campbell says that he told Brown he would go across the bridgeway (a foot bridge across Stock Creek between the main line and the switch) to the main line, and see if all the cars standing there were coupled together, and that this understanding was reached between them. At any rate, Campbell did go across to the main line, and Brown did cut the engine and tender loose, go up to the switch, out on the main line, and back down on the main line with the engine and tender for the last draft of cars. Campbell, who had ridden the cars, had cut the engine and one car loose when the first draft had been placed on the main line. In cutting them off, it so happened that they were left partly on and partly off of the bridge, two gondola cars and half of a box car projecting out on the bridge, and the balance of the draft coupled thereto standing east of the bridge. As Brown went back for the last draft of cars, he rode on the rear end of the tender for the purpose of giving the engineer signals for the coupling, and, as he claims, expected to find Campbell at the end of the cars with his light. He saw Campbell's light at the end of the bridge, and did not signal the engineer to slow down until he got close enough to see the end of the gondola by the light which he himself carried in his hand; in other words, he reached the end of the cars in a shorter distance by the length of two gondolas and half a box car than he expected. The engineer in moving the engine was being guided by the signals given him from Brown's lamp, and was also being influenced in the speed at which he was running by the position of Campbell's light, although his statements and Brown's upon this subject do not entirely correspond. It seems, however, that the cars were closer to the engine and tender than either Brown or the engineer supposed, and notwithstanding Brown's signal to the engineer immediately upon discovering them, the coupling was made at a greater rate of speed than

would have been used had they known their exact location. The automatic coupling was made successfully, nothing was broken, and neither the brakeman, conductor, nor engineer, thought that anything very unusual had happened. The plaintiff testifies, however, that he was standing on his side of the engine looking for signals, and getting ready to fire his engine, and not expecting the coupling to be made; and that when the engine and cars came together, he was knocked out of the engine, and fell to the bottom of the bridge, landing in the creek and sustaining severe injuries. The fact that he had fallen was not discovered by any of the crew until they had gone back over the switch with the last draft of cars.

From this statement of facts, it will be seen that the real point in controversy is whether or not Brown, the conductor, knew, or ought to have known the position of the cars to which he was to couple the engine, and whether or not the rate of speed at which the engine was moving under his direction was such as to constitute negligence.

The jury rendered a verdict for the plaintiff, which the court refused to set aside, and the defendant in the court below, plaintiff in error here, the Virginia & Southwestern Railway Company, having obtained a writ of error, assigns the following grounds for the reversal of that judgment.

The plaintiff was asked, as a witness in his own behalf:

"Q. If the coupling had been made in the usual or ordinary way, would you, or would you not, have been thrown from the cab?

"A. No, sir, if they had been coupled in the right manner, I would not have been thrown out."

To this question and answer there was a general objection which the court overruled. It is claimed in the petition that while the objections relied upon do not appear in the record, the question and answer were wholly inadmissible for any purpose.

It may be that the question is obnoxious to the objection that it is a leading one, and that the answer expresses the opinion of the witness and not a fact. Without deciding whether or not either of these objections is well taken, or whether in any event it would constitute reversible error, we shall content ourselves with calling attention to the fact that at another point in the testimony of the plaintiff, this question was asked him:

"Q. How did they throw you?

"A. I went out head foremost. It was an unusual lick. If it had been hit by a lick that cars ought to be coupled, it wouldn't have thrown me. I had hold and was looking out for it, and always did look out for anything like that when we was shifting."

This question and answer were not objected to, so that if the error under consideration was sustained, there would still be evidence in the record covering the identical point, to which no objection was made.

Objection is also made to the ruling of the court, refusing to allow the plaintiff in error to prove by the witness, Brown, that it was not his duty as conductor to give his brakeman, Campbell, any detailed instruction about going to the end of the cars to which the coupling in question was to be made; and a like offer of proof which occurs in the testimony of the witness, McCue, which was also rejected by the court.

If the refusal to permit plaintiff in error to introduce the evidence referred to was erroneous, the error was cured by instruction 6 given at the instance of plaintiff in error, in which the court told the jury that the conductor had the right to presume that his brakeman, Campbell, was acquainted with the usual and customary method of performing his duties, and it was not the duty of the conductor to give him special instructions with reference thereto. The plaintiff in error could not have been prejudiced by the ruling of the court excluding evidence tend-

ing to show that it was not the duty of the conductor to do a particular act, when the point was covered by an instruction of the court which states that as a matter of law no such duty devolved upon him. We refrain from any expression of opinion upon either ruling of the court involved in this assignment of error, except to observe that in the result there was clearly no prejudice to the plaintiff in error.

Another objection taken to the exclusion of testimony is to the refusal of the court to permit McCue, "an experienced railroad man," to prove that it was not the duty of the conductor to know exactly where the cars were left that were being shifted.

There had been direct evidence that it was the duty of the conductor to know. It was proved that the company had no rule upon the subject; and McCue was expected to testify from his general information with respect to the operation of other roads. He was asked this question: "Where, as in this case, the conductor was attending to the shifting of the cars and also to the switching, would it or not be his duty to know the exact place where the cars had been left to which he was going back to couple?" To which question and any answer thereto, the plaintiff by counsel objected, and the court sustained said objection, and refused to allow the witness to answer. Thereupon, without any distinct avowal by counsel for defendant, the court understood from the question and general drift of the examination that, if permitted to do so, the defendant would prove by the said witness McCue, that in general railroad practice, it would not be necessary or incumbent upon the conductor to give specific directions to the brakeman to go with his light to stand at the end of the train for the purpose of assisting in making the coupling, but that, according to general railroad rules and practice it would be considered by the conductor that the brakeman would know that it was his duty to go to the end of the cars with

his light, without being specifically told so to do, and that where, as in this case, the conductor was attending to the shifting of the cars, and also to the switching, it would not be his duty to know the exact spot where the cars had been left, to which he was going back to couple. But the court, notwithstanding said statement of counsel, refused to allow the said witness to answer the above questions, and refused to allow the defendant to prove the facts set forth in the above statement of counsel.

So much of this exception No. 3 as refers to the duty of the conductor to give specific directions to the brakeman has already been sufficiently disposed of in discussing the assignment of error with reference to the question asked Conductor Brown; and as to so much of it as has reference to the duty of the conductor to know the exact place where the cars had been left, it is to be observed that the gravamen of the charge of negligence upon the part of the conductor is that he permitted the engine to approach at a dangerous speed the cars to which the coupling was to be made, and that it was his duty to know, not the exact position of those cars, but to have such a reasonable knowledge of their situation as would have enabled him to make the coupling with safety. The question in terms asks the witness, would it or not be the duty of the conductor "to know the exact spot at which the cars had been left to which he was going back to couple." To this question the witness would have made the categorical answer, that "it was not his duty to know the exact spot," an answer which would have been, or might have been, absolutely true as a response to the question in the precise terms in which it was propounded, and yet have been utterly misleading.

The action of the court in allowing the witness, Skeen, to testify as to the expectancy of life of a man of the age of defendant in error, and in allowing the introduction before the jury of certain mortality tables, is assigned as error.

The expectation of life of the defendant in error was one of the factors to be considered by the jury in ascertaining the compensation to be given him for a permanent injury. The expectation of life is of course incapable of exact ascertainment. All that can be done is to place before the jury the best evidence obtainable, to be considered by them under the direction of the court. Tables of mortality are usually esteemed the safest guides upon the subject, to be taken by the jury and weighed along with other facts and circumstances applicable to the expectation of the particular life under consideration. It is the best method of dealing with the subject of which the nature of the case admits.

The instructions asked for by the plaintiff and given by the court correctly state the law. Indeed, no objection is urged to any of them, except No. 4, which relates to the measure of damages, and which has been sufficiently disposed of in dealing with the admissibility of the testimony of the witness Skeen.

The defendant asked for several instructions, all of which were given, except No. 8. Nos. 5 and 6, however, were modified by the court. As originally asked, No. 5 was in the words following:

"The court instructs the jury that if they believe from the evidence that it was the duty of W. R. Campbell, the brakeman, under the circumstances in this case, to have gone with his lantern to the end of the car to which the engine was going to couple, and that he failed to go to the end of said car, and that the accident to plaintiff resulted from such failure of said brakeman to perform such duty, they will find for the defendant."

The modification consisted in inserting the word "solely" after the word "resulted," so as to make it read, if "the accident to plaintiff resulted solely from such failure of said brakeman to perform such duty, they will find for the defendant."

The purpose of the amendment is obvious. There was evi-

dence tending to prove negligence upon the part of the conductor, who was not the fellow-servant of the defendant in error, but was as to him the vice-principal. There was evidence tending to prove negligence upon the part of Campbell, the brakeman, who was the fellow-servant of defendant in error. If, therefore, the negligent act which caused the injury was due solely to the misconduct of the fellow-servant, the railroad company was not responsible; but if the misconduct of the vice-principal entered into and constituted a part of the negligent act which caused the injury, then the courts will not undertake to distribute the fault, but will hold the railroad company responsible as though it alone were guilty. *N. & W. Ry. Co.* v. *Nuckols,* 91 Va. 193, 21 S. E. 342.

The same principal controls the amendment introduced by the court in the second branch of this instruction, and we are of opinion that the amendments made by the court were proper, and this assignment of error is overruled.

The court also, of its own motion, gave an instruction which we think is, under the evidence in this cause, plainly right, and the objection to which is, therefore, overruled.

This brings us to the consideration of instruction No. 8 asked for by the defendant, and refused by the court. It is as follows:

"The jury are further instructed that although they may believe from the evidence that it was the duty of Conductor Brown to know the location of the cars that he was going back to couple to, and that he neglected this duty and did not know the location thereof, yet if they believe from the evidence that said conductor believed, and, under all the circumstances of this case, had the right to believe, that Campbell, the brakeman, would be, with his lantern, at the end of the car to which they expected to couple, and further believe that if said Campbell had been at the end of said car with said lantern, the accident would not have occurred, they will find for the defendant."

This instruction is predicated upon the concession that it was the duty of Conductor Brown to know the location of the cars he was going to couple to, and that he neglected this duty; and rests the defense upon the ground that the fellow-servant was guilty of negligence.

As we have already seen, if Brown, who was the vice-principal, was guilty of a fault which entered into and constituted a part of the negligence which resulted in the injury of the plaintiff, then the railroad company is responsible, although Campbell, the brakeman, who was a fellow-servant, was also in fault, the court in such cases holding that where injury to a servant has been caused by the fault of a fellow-servant, concurring with the negligence of the master, the latter is liable as though he only was at fault. The fault of this instruction is that it is predicated upon the concurring negligence of the conductor, who was the vice-principal of the master, and of a fellow-servant.

There was a motion to set the verdict aside as contrary to the evidence, which was properly overruled. The testimony, considered as upon a demurrer to evidence, establishes the negligence of the plaintiff in error as being the proximate cause of defendant in error's injury.

The motion in arrest of judgment was also properly overruled.

There was no demurrer to the declaration, and we are not prepared to say that it could have been adjudged insufficient had a demurrer been interposed. If the declaration was less specific in its allegations of negligence than it should have been, we are still of opinion that a judgment upon it should not be arrested. Concede that the evidence went beyond the averments of the declaration, yet it is apparent that the plaintiff in error has suffered no prejudice upon this account, but that it presented its entire case to the jury. The objection should have been made

by the defendant when the infirmity, if it exists, was disclosed. It should not have waited until a verdict had been rendered. If the objection had been made during the trial the court, if it considered that substantial justice would have been promoted, and that the opposite party would not have been prejudiced thereby, would have allowed the pleadings to be amended on such terms as is deemed reasonable. Code, sec. 3384. The observations of Judge Buchanan in the case of *Bertha Zinc Co.* v. *Martin*, 93 Va. 601, 22 S. E. 869 are equally applicable here. "If there was such a variance as that complained of, the objection ought to have been made in the trial court either by objecting to the evidence when offered, or by a motion to exclude after the evidence had been received. Section 3384 of the Code was enacted to obviate the difficulties which frequently arise after a trial has been commenced, when it appears that there is a variance between the evidence and allegations in the pleadings, by allowing the pleadings to be amended upon such terms as to continuance and costs as the court may deem reasonable, or by directing the jury to find the facts, and after such finding, if the court be of opinion that the variance was such as could not have prejudiced the opposite party, it gives judgment according to the right of the case.

"The objection now made for the first time should have been made in the court below, so that the plaintiff in that court might have had an opportunity to have moved the court to have adopted the one or the other of the courses provided by the statute. Having failed to do this, we do not think that the question can be raised here for the first time, and this assignment of error must be overruled."

In that case it appears that the objection was made for the first time in this court, while in the case before us it was made in arrest of judgment. The difference is one of degree rather than of kind. The point is, that it should have been made, in

the language of Judge Buchanan, "when the evidence was offered, or by a motion to exclude after the evidence had been received." It is manifest that the plaintiff in error has suffered no prejudice in the trial court, that it made a full defense, and that the judgment has been rendered according to the very right of the case.

We are of opinion that there is no error in the record for which the judgment should be reversed.

*Affirmed.*