## Wytheville.

## PORTNER, ET AL, *v.* PORTNER'S EXECUTORS, ET AL.

### June 15, 1922.

1. WILLS—*Probate—Execution—Testamentary Capacity—Undue Influence—Case at Bar.*—In the instant case, the probate of a will was opposed on the grounds that it was not executed in accordance with the formalities required by law, and that the testator was mentally incapable of making a will, and that he had executed the same as the result of undue influence.

   *Held:* That, upon the evidence, the jury upon an issue of *devisavit vel non* was abundantly justified in finding adversely to each of the grounds upon which the will was assailed, and in returning a verdict sustaining the will.

2. WILLS—*Execution and Acknowledgment—Evidence of Sufficient Execution—Case at Bar.*—In the instant case, the will was in due form and was attested by three competent witnesses (one more than the statute requires), two of whom testified that the will was both signed and acknowledged by the testator in the presence of all three of them, and one of whom testified that it was not signed in his presence, but that he did attest the signature.

   *Held:* That the evidence, if it did not overwhelmingly prove the due execution and acknowledgment of the will, clearly preponderated to that effect, and fully justified a verdict sustaining the will.

3. WILLS—*Testamentary Capacity—Case at Bar.*—Testator had been drinking heavily a short time prior to the execution of the will, and was not only suffering from the effect of too much indulgence in this way, but was a sick man, in a hospital, under the care of physicians and nurses when the will was made. But the evidence as presented was such as to leave small room to doubt that at the time he signed and acknowledged the will, he fully understood what he was doing.

   *Held:* That, in any possible view of the evidence, the appellate court could not properly interfere with the verdict of the jury in sustaining the will.

4. WILLS—*Undue Influence—Sister of Testator—Case at Bar.*—In the instant case a will was assailed on the ground of undue influence exercised over the testator by the beneficiary, his sister. The only direct testimony to that effect was a statement by one of the contestants, another sister of the testator, that some time after the will was executed the beneficiary said to her that she had seen to it that the testator had made a will. This was denied by the benefi-

ciary, and the decided weight of the testimony showed that neither the beneficiary nor her husband even knew that the will was to be made, or that it had been made, until some hours after its execution. The evidence in regard to the circumstances attending the execution of the will exculpated the beneficiary from the charge of exercising undue influence, and while it appeared that the testator was an affectionate brother and on good terms with all of his brothers and sisters, it also appeared that he was especially devoted to the beneficiary.

*Held:* A verdict sustaining the will would not be disturbed.

5. WILLS—*Undue Influence—Gift of Testator's Entire Estate to One Sister to the Exclusion of Other Brothers and Sisters.*—While if nothing but the kinship of the parties appeared, it would perhaps seem strange that the testator gave practically all of his estate to one sister and her child to the exclusion of other brothers and sisters, with whom he was on good terms, yet of itself this fact does not prove undue influence or mental incapacity.

6. WILLS—*Contest—Evidence—Case at Bar.*—In the instant case, a contest of a will, it was objected that the lower court refused to permit contestants to introduce certain evidence as to the provisions of the will of testator's father, from whom testator derived the bulk of the property involved in the litigation, and an agreement between testator and his brothers and sisters that neither of them would make a will in contravention of the general testamentary scheme of his father.

*Held:* That, while some of the rulings of the trial court did tend to cut off a development of the terms of the father's will, and the alleged agreement, yet the record as a whole showed that the contestants had the full benefit before the jury of these contentions.

7. WILLS—*Contest—Character of Witnesses.*—While as a general rule the character of a witness cannot be attacked except by evidence concerning her general reputation for truth and veracity, yet where a woman, a witness in a will contest, made an incredible statement under the circumstances of the case, the jury was entitled to know what sort of a woman she was, and evidence that she kept a house of ill fame was admissible.

8. EVIDENCE—*Admission of Evidence—Waiver of Objections—Introduction of Same Evidence Without Objection.*—Although the introduction of certain evidence might have been error in the first place, subsequent introduction of the same evidence without objection constitutes a waiver of the previous objection.

9. WILLS—*Contest—Evidence—Harmless Error.*—In the trial of a will contest it was assigned as error that the court refused to permit contestants to prove that the whole estate left by the testator was derived from his father's will, except a small equity in a house and lot. It appeared that after the court refused to allow certain questions in this connection to be answered, counsel for contestants indicated that it was not desired to press the inquiry further; and

furthermore the jury were fully apprised of the fact that the whole of the estate involved had been derived from testator's father.

*Held:* That the action of the court was not reversible error.

10. WITNESSES—*Examination—Leading Questions—Discretion of Court.*— The matter of allowing leading questions rests very largely in the discretion of the trial court, and the Supreme Court of Appeals will rarely interfere with the action of the lower court merely upon this ground.

11. WITNESSES—*Examination—Leading Questions—Harmless Error.*—Error in permitting a leading question to be asked of a witness is harmless, where the witness's testimony at large confirms the answer which she gave to the leading question complained of, and in substance was to the same effect.

12. WILLS—*Declarations of Testator—Admissibility—Case at Bar.*—In a will contest a statement of a witness that he had overheard the testator declare that he was "going to leave everything I've got to my sweetheart," and that his sweetheart was his sister, the beneficiary under the will, was objected to on the ground that there ought to have been some time fixed showing that the declaration in question was reasonably near the execution of the will.

*Held:* That the declaration of the testator's intention was so interwoven with his expression of affection for his sister as to make it proper evidence. Moreover, it was proper as showing that nothing had happened to make testator change his mind.

13. APPEAL AND ERROR—*Instructions—Record—Certificate—Case at Bar.*— In the instant case, the certificate purporting to embrace the instructions was so phrased as to make it appear that those offered by the contestants and refused, and the refusal of which was assigned as error, were in fact the instructions granted; and there was no certificate at all which even purported to set forth the instructions given and the giving of which was assigned as error.

*Held:* That, while the Supreme Court of Appeals would perhaps be warranted in holding that the contents of the instructions certified demonstrated that they were offered by the contestants and that the court necessarily meant to certify them as having been refused instead of as having been given, yet the fact that there was no certificate of the instructions given, while evidently an oversight, was a legal obstacle to the consideration of even those certified as refused. In the absence of the former it could not be said that there was error as to the latter.

14. APPEAL AND ERROR—*Instructions—Harmless Error.*—Where there were numerous instructions in a case and some of the rulings of the court thereon were not free from fair criticism, yet when the instructions are viewed as a whole no reversible error is found, the judgment of the lower court will not be reversed for error in the instructions.

15. EXCEPTIONS, BILL OF—*Time of Signing.*—Where certificates of exception are not signed by the trial judge within sixty days from the date of the final judgment, they cannot be considered on appeal.

16. EXCEPTIONS, BILL OF—*Time of Filing—Unwarranted Refusal of Judge to Sign.*—Where bills of exception are tendered to the trial judge within

the time required by statute and under such circumstances as that upon a refusal to sign them the party making the tender would be entitled to a mandamus compelling the judge to affix his signature, then the bills, though signed after the expiration of the statutory period, will be regarded as a part of the record.

17. EXCEPTIONS, BILL OF—*Time of Filing—Duty of Trial Judge.*—It is incumbent upon the trial judge to give prompt and diligent and faithful attention to exceptions tendered within the time prescribed, and if reasonably possible to sign them within that time.

18. EXCEPTIONS, BILL OF—*Time of Filing—Duty of Trial Judge.*—But the trial judge cannot be required to act blindly and sign exceptions which he has had no fair opportunity to examine if such a course be necessary to allow his signature within the statutory period.

19. EXCEPTIONS, BILL OF—*Time of Filing—Purpose of Section 6252 of the Code of 1919—Judge Entitled to Time for Consideration.*—The purpose of section 6252 of the Code of 1919 is to allow sixty days after final judgment within which counsel may prepare and present, and the court may examine, correct if necessary, and sign the exceptions. The whole time is not given to counsel. Some of it, such as may be under all the circumstances fair and just, belongs to the trial court. He is only required to sign certificates which are substantially correct, and he must have a reasonable opportunity to examine their contents. When concededly correct certificates are tendered in a reasonable time, but not signed because of the illness or death of the judge, the limitation would not apply.

20. EXCEPTIONS, BILL OF—*Time of Filing—Judge Entitled to Time for Consideration—Case at Bar.*—In the instant case, certificates of exceptions were presented to the trial judge after notice given him by telegram at 4 o'clock p. m. the day before, on Saturday, October 2d. The following Monday, October 4th, was the last of the sixty days from the date of the final judgment, and a term of the Judge's court began on that day. The exceptions presented were numerous and the trial had been long and the evidence extensive. It developed afterwards that some of the exceptions were not approved and had to be amended.

*Held:* That the Supreme Court of Appeals was not prepared to say that if the judge had refused to sign the exceptions at all, it would have awarded a writ of mandamus to compel him.

21. APPEAL AND ERROR—*Reversible Error.*—It is incumbent on the party appealing to affirmatively show reversible error.

22. EXCEPTIONS, BILL OF—*Time of Filing—Certificates of Exceptions Dependent Upon a Consideration of the Evidence.*—Where a consideration of the evidence introduced at the trial was essential to a determination of the materiality of the questions raised by each of the certificates of exceptions numbered 1 to 11, in the instant case, it is immaterial whether they were signed within sixty days after final judgment by the trial judge or not, where the certificate purporting to embody all of the evidence was neither tendered nor signed within that time.

23.  EXCEPTIONS, BILL OF—*Time of Filing—Controversy Between Judge and Counsel as to Time of Filing—Finality of Certificate of Trial Court.*— In the instant case, it appeared from the affidavits of counsel that they had prepared and tendered and thought they had left with the judge a certificate covering all of the evidence in the instant case within sixty days from final judgment.  The certificate of the judge, however, was to the contrary.

*Held:*  That the Supreme Court of Appeals must accept the certificate of the trial court as final.

24.  EXCEPTIONS, BILL OF—*When Irregular Bills Treated as Part of Record.*— Only in cases where the undisputed facts show that appellants have done all that they are required to do, and would therefore be entitled to a mandamus, will the Supreme Court of Appeals treat irregular bills or certificates of exception as parts of the record without any direct proceedings for that purpose.

25.  EXCEPTIONS, BILL OF—*Time of Filing—Necessity of Compliance with Statute.*—Where it appeared from a positive certificate by the judge of the trial court that the certificate of exception embodying the evidence in the instant case was not signed by him within the sixty days after final judgment allowed by statute, and all the other exceptions in the case were necessarily dependent for their materiality upon a consideration of the evidence, the appeal must be dismissed.  It is not a matter of discretion with the Supreme Court of Appeals, which had no more jurisdiction to consider the evidence appearing in the certificate than it would have had if it had never been presented to or signed by the judge at all.

Error to a judgment of the Circuit Court of Prince William county, admitting a will to probate.

*Dismissed.*

The opinion states the case.

*I. L. Costigan, John L. Lee, Thos. H. Lion* and *R. E. Byrd,* for the plaintiffs in error.

*H. T. Davies, Eppa Hunton, Jr.,* and *John S. Barbour,* for the defendants in error.

KELLY, P., delivered the opinion of the court.

Paul V. Portner died on the 29th day of October, 1919, leaving a will dated and executed June 2, 1917,

whereby he devised and bequeathed practically all of his estate, valued at about $250,000, to trustees for the sole benefit of his sister, Mrs. Etta P. Meredith, for her life, with remainder in fee to her daughter, Sylvia Meredith.

The testator was about thirty-six years old at the time of his death, and had never married. Surviving him as his heirs and distributees were two brothers, four sisters, and one nephew, son of a deceased brother.

When the will was offered for probate all the heirs and distributees, except Etta P. Meredith, beneficiary as aforesaid, appeared in opposition thereto, and an issue of *devisavit vel non* was submitted to a jury, which, after a trial consuming many days and involving much testimony, returned a verdict sustaining the will. Thereupon the circuit court entered judgment admitting the will to probate, and to that judgment a writ of error was awarded by one of the judges of this court.

[1] The probate of the will was opposed on the grounds, first, that it had not been executed in accordance with the formalities required by the statute; second, that the testator was mentally incapable of making a will; and, third, that he had executed the same as the result of undue influence.

The record presented to us comprises over 1,600 printed pages, and the greater part of it is made up of what purports to be the evidence introduced at the trial. If it were feasible it would not be profitable to set out here anything like a full statement of the alleged evidence. It must suffice to say that after having heard the arguments of counsel on both sides of this controversy, and after having read the printed briefs filed in the cause, we have studied the evidence purporting to be shown by the record, and if this

evidence were so certified as that we could pass upon it judicially, we would say that the jury was abundantly justified in finding adversely to each of the grounds upon which the will was assailed, and in returning the verdict which is here complained of.

[2] The will was in due form and was attested by three competent witnesses (one more than the statute requires), two of whom testified that the will was both signed and acknowledged by the testator in the presence of all three of them, and one of whom testified that it was not signed in his presence, but that he did attest the signature. Without going further into the particulars of the testimony in this respect, it is sufficient to say that, if it did not overwhelmingly prove the due execution and acknowledgment of the will, it clearly preponderated to that effect, and fully justified the verdict in that particular.

[3] As to the mental condition of the testator, it is true, and is not denied, that he had been drinking heavily a short time prior to the execution of the will, and was not only suffering from the effect of too much indulgence in this way, but was a sick man, in a hospital, under the care of physicans and nurses when the will was made. But the evidence as presented is such as to leave small room to doubt that at the time he signed and acknowledged the will, he fully understood what he was doing, and that the jury could hardly have been expected to reach a different conclusion. In any possible view of the evidence an appellate court could not properly interfere with the verdict in this respect.

[4, 5] As to the remaining ground upon which the will is assailed, the alleged undue influence over the testator, it is safe to say that evidence upon which to base this contention is almost wholly wanting. The

17

only direct testimony to that effect is a statement by one of the contestants, a sister of the testator, that some time after the will was executed Mrs. Meredith said to her that she "had seen to it" that Paul had made a will. This is denied by Mrs. Meredith, and the decided weight of the testimony shows that neither Mrs. Meredith nor her husband even knew that the will was to be made, or that it had been made, until some hours after its execution. It seems that in the afternoon of the day on which the will was executed, the testator showed to Mr. Meredith a copy thereof, and that the latter shortly thereafter told his wife about it. Neither Mrs. Meredith nor her husband was present when the will was dictated, or when it was signed, and there is nothing at all in the testimony to indicate that the slightest suggestion was made to the testator by anybody, either that he should make a will, or that he should make it in any particular way. Unless we are to reject positive testimony and indulge in suspicion and conjecture, we must believe from the evidence that on the day before the will was made, the testator himself telephoned his own lawyer, procured an interview with him at his apartment in the Bellevue hotel, in Washington, dictated to him the provisions which he desired to have incorporated in the paper, and that on the next day after the attorney had prepared the will and after the testator had been taken to the hospital, the attorney brought the will there, read it to the testator, who expressed satisfaction with its provisions (and who later, but on the same day, read a carbon copy and again expressed satisfaction with it), and that he thereupon duly signed and acknowledged the paper without aid or suggestion or influence from any source whatever. The original will at his request was retained by his

counsel, and a copy thereof was left with the testator, who subsequently placed it in one of his safe deposit boxes in his bank, where it was found more than two years later, just after the testator's death. And it is worthy of note in this connection that in another of his safe deposit boxes were found the only two insurance policies which the testator had, one of which was made payable, in the event of his death, to his sister, Mrs. Meredith, and the other to his niece, Sylvia, the same persons who were named as beneficiaries in the will.

If nothing but the kinship of the parties appeared, it would perhaps seem strange, though it would not in itself prove undue influence or mental incapacity, that the testator gave practically all of his estate to one sister and her child; but this disposition of the property is satisfactorily explained in the certificate of the evidence which the appellants have presented to us with this appeal. From what appears in that certificate, the jury would have been well warranted in finding that, while he was an affectionate brother and on good terms with all of his brothers and sisters, he was especially devoted to Mrs. Meredith, and that, in view of this fact and of the manner in which he had always treated her, the provisions of his will were not unnatural.

What has been said would be sufficient (if the record were properly certified) to dispose of the assignment of error based upon the refusal of the court to set aside the verdict as contrary to the evidence, and we shall now advert to the other assignments appearing in the petition for the appeal.

[6] Assignments 1, 2 and 3 are treated under one head in the petition, and we shall deal with them accordingly. They are based upon the refusal of the

court to permit the contestants to introduce certain evidence as to the provisions of the will of Robert Portner, the father of the deceased, from whom the latter derived the bulk of the property involved in this litigation, together with certain evidence tending to prove that, after a certain trust clause in the Robert Portner will had through judicial proceedings been annulled, for reasons which need not be recited here, Paul Portner and his brothers had agreed among themselves that neither of them would make a will, so that in case of their death the property they had derived from their father would, notwithstanding the cancellation of the trust clause, pass in practically the same manner to all of their surviving brothers and sisters as it would have done if their father's will had remained in full force and effect.   We have given very careful consideration to the question here presented, and find that while some of the rulings of the trial court, standing alone, did tend to cut off a develop-. ment of the terms of the Robert Portner will and proof of the alleged agreement between Paul Portner and his brothers not to make a will, yet the record as a whole, assuming it to be properly before us, shows that the provisions of the Robert Portner will pertinent to this inquiry were all before the jury, that counsel for the appellees during the course of the trial expressly withdrew their objection to any evidence tending to show the agreement between Paul Portner and his brothers, and that the appellants had, or at least were given the opportunity to have, the full benefit for whatever it may have been worth before the jury of their contention that Paul Portner did agree not to make a will in contravention of the general testamentary scheme of his father.   Of course, it is not contended that such an agreement on Paul Portner's

part could have affected the validity of any will which he might have made in violation thereof. The only ground on which the contestants sought to introduce this proof was that it tended to show that Paul Portner, who was a man of integrity, would not in his right mind have executed a will contrary to such an agreement. The appellants were ultimately given a free hand in submitting this contention, with evidence in support of it, to the jury, and the first three assignments of error, therefore, appear to be without merit.

The next assignment calls in question the action of the trial court in permitting a witness named Rice to testify that one Mrs. Durphy, otherwise known by the name of Bessie Brown, had kept a house of bad fame in Washington under the latter name. The ground upon which it is urged that this testimony ought to have been excluded in that the character of Mrs. Durphy could not be attacked except by evidence concerning her general reputation for truth and veracity, and that her reputation in other respects was not relevant. The soundness of the general proposition here invoked may be conceded, but there were several reasons, not involving the character of this witness for truth and veracity, why it was proper for the court to admit the evidence in question. We shall mention only one of these reasons.

[7] Mrs. Durphy testified that she had known Paul Portner well for a good many years, and that on one occasion in April, more than a month prior to the date of the execution of the will, when he was in a hospital in Washington, she had visited him and had taken with her a dog which he had asked her to keep. She further testified that on that occasion when she was about to leave, he begged her to stay, and said to her in substance that he did not want to be left alone at

that time because his sister and her husband (without designating them) were, as he feared, coming to the hospital to try to get him to make a will; that she said to him that she would not make a will if she did not want to, and advised him not to do it, and that he replied, "Why, they are after me all the time."

The record as presented to us indicates that at this time there were in the city of Washington several of his sisters and brothers, and that his relations with all of them were most cordial and affectionate. The record further shows, and it is one of the earnest contentions of counsel for the appellants, thoroughly well supported by the alleged evidence, that Paul Portner, although a dissipated man, had always treated his sisters with the utmost tenderness, respect and affection. In the face of this fact it seems inconceivable that he would have asked a woman of bad character to stay in the hospital in order to protect him against some insistence and coercion which he feared on the part of one of his sisters. No authority is needed for the proposition—it is clear as a matter of reason and justice—that, in testing the credibility of this woman's statement as to what transpired between her and Paul Portner on that occasion, the jury ought to have known what sort of a woman she was. That fact would undoubtedly have a bearing upon the reasonableness and probability of her story. We have no doubt that the testimony here objected to did have something to do with the small weight which the jury probably attached to her statements, but that was as it should be. The evidence presented to us shows conclusively that Paul Portner was peculiarly devoted to Mrs. Meredith, and, to say the least, it seems improbable and unreasonable that he would have been willing to insist on keeping this woman in his room

at the hospital as a safeguard against the influence which he feared Mrs. Meredith might undertake to bring to bear on him when she came to see him. Mrs. Durphy does not say that she thought Mrs. Meredith was the woman who was coming to try to have the will made; she claims to have thought at the time that it was another sister, but that makes no difference. Paul Portner would have had more respect than this for any of them; and, furthermore, the fact now appears that if what Mrs. Durphy said, and what appellants were trying to prove by her, was true, the woman he was afraid of was in fact his favorite sister, Mrs. Meredith, who is now charged with exercising undue influence over him.

[8] Without referring to other grounds upon which the testimony of the witness Rice might properly have been admitted, we will add that if the objection thereto had been good in the first instance, it was subsequently waived. When Mr. Meredith was on the stand he testified in effect that Mrs. Durphy was one and the same person as Bessie Brown and that she was a woman of bad reputation in Washington. There was no objection to this testimony by him, and if it had been error to admit it in the first place, subsequent introduction of the same evidence without objection constituted a waiver of the previous objection. *C. & O. Ry. Co.* v. *Greaver*, 110 Va. 350, 354, 66 S. E. 59; *Va. & S. W. R. Co.* v. *Bailey*, 103 Va. 205, 49 S. E. 33; *Moore Lumber Corporation* v. *Walker*, 110 Va. 775, 67 S. E. 374, 19 Ann. Cas. 314; *Douglas Land Co.* v. *Thayer*, 107 Va. 292, 299, 58 S. E. 1101.

[9] The next assignment of error is that the court refused to permit the petitioners to prove that the whole estate left by Paul Portner was derived from his father's will, except a small equity in a house and

lot.   The certificate of exception presenting this question is very meager, and certainly falls short of disclosing reversible error.   The witness under examination had already stated, in answer to a question as to whether Paul Portner had received any estate except that which he got from his father's will, that he "had a small equity in a small house and lot." The questions which he was not permitted to answer were: "How did he get that?" and "What was its value?"   The certificate shows that after the court refused to allow these questions to be answered, counsel for the appellants said: "That equity was so small that it had no effect on the value of the estate," and indicated that it was not desired to press the inquiry further, and the court said: "I do not think that effects any question at issue in this case."   Furthermore, as shown by the certificate of the evidence at large, the jury were fully apprised of the fact that the bulk of the estate involved had been derived by Paul Portner under his father's will.

It is next insisted that the court erred in permitting Miss Hannah Mackzum, one of the attesting witnesses, to be asked and to answer the following questions:

"Q.   I hand you the paper purporting to be the will of Mr. Paul V. Portner   *   *   and ask you if that is the paper you have been referring to in your testimony?

"A.   Yes, sir.

"Q.   Is that your signature to the attesting clause?

"A.   Yes, sir.

"Q.   Please state whether or not the facts stated in that clause are true or not.

"A.   Yes, sir."

The certificate presenting this question does not state any ground upon which the objection to this

testimony was based, but the petition bases it on the ground that the witness was improperly allowed to answer a leading question upon a very material point. The attesting clause, which the witness said contained a true statement of facts, was as follows: "Signed, sealed, published and declared by the above named testator, Paul V. Portner, as and for his last will and testament, in our presence, and we, at his request, in his presence and in the presence of each other, have hereunto subscribed our names as attesting witnesses, on the day and year last herein above written."

[10, 11] It may be that if the court's attention had been called to the fact that this was a leading question, the objection would have been sustained, and the question required to be put in another form, but even if it had been overruled, the failure to sustain the objection would not have constituted reversible error. It is conceded in the petition, and is, of course, perfectly well settled, that the matter of allowing leading questions rests very largely in the discretion of the trial court, and this court will rarely interfere with the action of the lower court merely upon this ground. But the record shows that Miss Mackzum knew and testified as to the condition of the testator at the time of the execution of the will; and, further, that she was quite fully examined as to the circumstances under which the will was signed and attested. Her testimony at large confirms the answer which she gave to the leading question here complained of, and in substance was to the same effect. Plainly no error is shown upon this point.

[12] Over the objection of the contestants, the court permitted the witness Clark Hall to testify that on one occasion, in the Bellevue hotel, in Washington,

he overheard a conversation between Paul V. Portner and a Miss Brown, a manicurist, in which Miss Brown spoke of one Mr. Dunlap, who had just left the hotel, saying that he was going to hurry away and have a change made in his will, and that Miss Brown then said: "Mr. Paul, what are you going to do with your will?" to which he replied: "Why, I am going to leave everything I've got to my sweetheart;" that Miss Brown then asked: "Who is your sweetheart?" and he replied: "It is Mrs. Meredith, my sister. She is the only sweetheart I have got." The certificate of exception indicates that the chief objection to the testimony in question was that the witness ought not to be allowed to detail a statement of the testator as to what he expected to do with his property. In the petition it is urged that there ought to have been some time fixed showing that the declaration in question was reasonably near the execution of the will. It does not appear that the witness could not fix the time, but we think this was immaterial. The testimony was admissible, regardless of the date. The declaration of the testator in regard to his intention was so interwoven with his expression of affection for his sister as to make it proper evidence. *Coffman* v. *Coffman*, 131 Va. 456, 109 S. E. 454; *Lester* v. *Simpkins*, 117 Va. 55, 83 S. E. 1062. The remoteness of the time of the declaration from the time of the will would have affected its weight but not its competency as evidence of his regard for his sister. Moreover, it must be remembered that the will was being attacked not only upon the ground of mental incapacity, but upon the ground of undue influence, and if this alleged statement to Miss Brown had taken place a long time before the will was executed, it would have been proper to let the jury hear it as tending to show that nothing

that happened about the time the will was made had operated to change his attitude toward Mrs. Meredith.

[13] The remaining assignments of error, eleven in number, relate to the action of the trial court in giving and refusing instructions. We have hitherto been considering this case as if we could look to what purports to be a certificate of the whole evidence. It must be manifest, however, that none of the several assignments which we have dealt with relating to the admission or exclusion of evidence could have been safely disposed of without a view of the evidence as a whole. This, of course, is peculiarly true with reference to the contention that the verdict was contrary to the evidence. It is equally true in regard to the instructions. As we shall presently see, there is no proper certificate of the evidence in the record, but this is not the only difficulty about the instructions. The certificate purporting to embrace them is so phrased as to make it appear that those offered by the contestants and refused, and the refusal of which is assigned as error, were in fact the instructions granted; and there is no certificate at all which even purports to set forth the instructions given and the giving of which is assigned as error. It is clear enough that this was a mistake, and as to the instructions refused we would perhaps be warranted in holding, and would probably hold, that the contents of the instructions certified demonstrate that they were offered by the contestants and that the court necessarily meant to certify them as having been refused instead of as having been given. But there is no certificate of those given, and this, while evidently an oversight, is a legal obstacle to our consideration of even those certified as refused. In the absence of the former we could not say that there was error as to the latter.

*Harris* v. *Commonwealth, post* p. 700, 112, S. E. 753, decided to-day, and cases cited.

[14] All of the alleged instructions, however, do appear in the transcript of the record presented to us, and we have looked to them with the same degree of care which we have given to the certificate of the evidence, but will not discuss them in detail. As is nearly always true where many instructions are involved, some of the rulings of the court thereon are not free from fair criticism, but we find nothing that we think would constitute reversible error upon a view of them as a whole. If the instructions given and refused had been certified and if the certificate of the evidence before us could be regarded as a part of the record, we would hold that the questions of fact were fairly submitted to the jury.

[15] But, as a matter of fact, there is no certificate of exceptions in this case which we can consider, and we shall be obliged to dismiss the appeal. The final judgment was rendered on the 5th of August, 1920. Not one of the certificates was signed by the trial judge within sixty days from that date. There were twelve of these certificates, the first ten of which related to the rulings of the court upon the evidence and instructions, and the eleventh to the refusal of the court to sign the first ten when presented. The twelfth purports to embrace the evidence in full. Certificates Nos. 1 to 10, inclusive, were presented to the trial judge on October 2, 1920, and, along with No. 11, were signed by him on the 16th of that month. Certificate No. 12 was presented and signed ten days later. The circumstances under which all but No. 12 were presented and signed appear from the recitals in number eleven, which is here set out in full.

## "CERTIFICATE NO. 11.

"Certificate to be incorporated as part of the record of the proceedings in the Portner will case pending in the Circuit Court of Prince William county, Va.

"Statement by Mr. Byrd, counsel for contestants:

"On the question of the probate of the will of Paul V. Portner, after the court had determined that the judgment and verdict should not be set aside, the following certificates were offered to the judge of the court on October 2, 1920, at his office in Alexandria, Va.

## "CERTIFICATES NOS. 1, 2, 3, 4, 5, 6, 7, 8, 9 AND 10.

"Whereupon, the court refused to consider the bills of exceptions offered by the contestants and refused to sign the same; whereupon the contestants, by Richard E. Byrd, protested, and beg that this be made a part of the record so that the same can be presented to the Supreme Court of the State of Virginia.

"Statement by Mr. Barbour:

"As counsel for the executors of the will I object to the signing of the bill of exceptions or any of them because they have never been presented to me and I have had no opportunity to examine them, criticise them, or call to the attention of the court any inaccuracy or insufficiency therein, if any there be.

"Statement by Judge Brent:

"The judge of the court states that Mr. Byrd is mistaken in saying that the court refused to sign the bills of exceptions.  The judge stated to Mr. Byrd that he would receive the bills of exceptions after the same had been presented to counsel for the proponents so that they might have an opportunity to examine them and that he would sign all proper bills of excep-

tions presented to him after that was done as of October 2, 1920. The judge never received any notice that this application was to be made to him until Friday, October 1, 1920, at 4 p. m., which notice was given to him by telegram signed by Mr. Byrd.

"The judge further states that his condition is such that it would be impossible for him to take this matter up before Saturday, October 16th, as court at Prince William county opens on Monday, October 4, 1920, and continues until that time, and, further, that it is a physical impossibility for the judge of the court to sign these bills of exceptions at this time, owing to the immense record that he would have to review in order to ascertain whether the bills of exceptions are proper or not.

"Statement by Mr. Byrd:

"In reply to the judge of the Circuit Court of Prince William county, the contestants of the will will say that they are perfectly helpless so far as the decisions of the court are concerned, and that the only thing that they can rely upon is the Supreme Court of Appeals of the State of Virginia, and Mr. Richard E. Byrd also protests that he has the right as attorney for the contestants to have these bills of exceptions signed which were taken from the record of the court and can be very easily verified. However, as the judge of the Prince William court says that he won't sign anything, there is nothing to do but leave to the Supreme Court the decision of the entire question.

"Statement by Mr. Barbour:

"Mr. Barbour, counsel for the executors, states that if permitted to do so he will take the bills of exceptions tendered to-day (October 2, 1920), examine them, and, on October 16, 1920, be prepared to suggest any amendments which may be proper but without preju-

dice to his right to object to their then being signed at all.

"Statement by Mr. Byrd:

"Mr. Byrd, counsel for the contestants, came in accordance with notice to the judge of the Prince William county court, State of Virginia, with certain bills of exceptions numbered as above herein set out; whereupon, the judge of the said court said that he would not consider the same, and therefore the contestants except and desire this exception to be made a part of their bills of exceptions; that R. E. Byrd came to the city of Alexandria, Virginia, on October 2, 1920, with all of the record of the Portner will case and offered to the judge of the court that record with the exceptions which the judge refused to consider.

"On October 16, 1920, counsel for proponents and exceptants again appeared before the judge at his office at Alexandria, Va., pursuant to the postponement above mentioned and counsel for proponent objected to any of the certificates tendered being then signed by the judge, but the said judge ruled that he would sign all proper certificates which had been tendered on October 2, 1920, as aforesaid, and would amend such as needed amendment to make them properly state the facts and thereupon he amends certificates Nos. 2, 3, 6 and 7 in certain particulars and signed all of said certificates as so amended this 16th day of October, 1920, but as of October 2, 1920, over the objection and exception of counsel for proponents, and this certificate referred to in each of said certificates is intended to be read as a part of each.

"Teste:                      "Sam'l G. Brent, judge."

[16-19] In *Conaway* v. *Commonwealth*, 118 Va. 792, 88 S. E. 75, and in *Lancaster* v. *Stokes*, 119 Va. 149, 89

S. E. 85, we held that where bills of exception are tendered to the trial judge within the time required by statute and under such circumstances as that upon a refusal to sign them the party making the tender would be entitled to a mandamus compelling the judge to affix his signature, then the bills, though signed after the expiration of the statutory period, will be regarded as a part of the record.   In neither of these cases, however, was any question raised as to what would be the effect of delaying the presentation of the bills until so late as that the judge could not reasonably pass upon them before the expiration of the period of limitation.   Undoubtedly, it is incumbent upon the trial judge to give prompt and diligent and faithful attention to exceptions tendered within the time prescribed, and if reasonably possible to sign them within that time.   As held in *Lancaster* v. *Stokes, supra,* it is his duty "to settle questions of dispute between counsel with regard to the evidence, and 'he cannot require counsel to agree upon a statement of the evidence as a condition precedent, nor plead lack of time or memory as justification   *   *   of refusal to certify the same.' " But this holding, of course, must be given a reasonable interpretation.   In no case has this court ever held that the trial judge can be required to act blindly and sign exceptions which he has had no fair opportunity to examine if such a course be necessary to allow his signature within the statutory period.   The obvious purpose of the statute is to allow sixty days after final judgment within which counsel may prepare and present, and the court may examine, correct if necessary, and sign the exceptions.   The whole time is not given to counsel.   Some of it, such as may be under all the circumstances fair and just, belongs to the trial court.   He is only required to sign certificates

which are substantially correct, and he must have a reasonable opportunity to examine their contents. In some cases this would require only a few minutes. In others, considerably more time might be necessary. Each case will depend on its own circumstances. When concededly correct certificates are tendered in a reasonable time, but not signed because of the illness or death of the judge, the limitation would not apply.

In *Conaway* v. *Commonwealth, supra,* and *Lancaster* v. *Stokes, supra,* it appeared that the exceptors were in no default and had done all they could have been required to do in compliance with the statute. In *Powell* v. *Terry,* 77 Va. 250, and *Dillard & McCorkle* v. *Dunlop,* 83 Va. 755, 3 S. E. 383, cited by Judge Whittle in *Lancaster* v. *Stokes,* it was held that the trial judge had not exercised due diligence, and had also in other respects committed error in refusing to sign the exceptions.

[20, 21] In this case, certificates Nos. 1 to 10 were presented to Judge Brent, after notice given him by telegram at 4 o'clock p. m. the day before, on Saturday, October 2d. The following Monday, October 4th, was the last of the sixty days from the date of the final judgment (*Kelly* v. *Trehy, ante* p. 160, 112 S. E. 757, decided to-day, and cases cited therein); and a term of Judge Brent's court began on that day. The trial in the instant case had been long, the evidence extensive, and the exceptions presented were numerous. It developed afterwards that some of them were not approved and had to be amended. Under these circumstances, we are not prepared to say that if the judge had, for the reasons stated, refused to sign the exceptions at all, and this were a direct proceeding to compel him by mandamus to affix his signature, we would award the writ. That might depend upon

18

a fuller development of the facts than we now have before us. But we need not decide this question. As already pointed out, a consideration of the evidence introduced at the trial is essential to a determination of the materiality of the questions raised by each of the certificates numbered 1 to 11. These questions are all of such a character as that if the court erred in respect to each of them, the errors might have been rendered harmless by facts developed in the evidence at large; and it is incumbent on the party appealing to affirmatively show reversible error. (*Colbert* v. *Callaham & Sons*, 132 Va. 475, 112 S. E. 756, and *Harris* v. *Commonwealth*, *post* p. 700, 112 S. E. 753, both decided to-day, and authorities therein cited).

[22] If, therefore, by an extremely liberal application of the rule announced in the *Conaway* and *Lancaster cases*, *supra*, we could hold that certificates 1 to 10, which in their original form were tendered on October 2d and afterwards, with certain amendments, and with certificate No. 11, actually signed on October 16th, should be regarded as having been signed on the former date, the certificate No. 12, purporting to embody all of the evidence, was neither tendered nor signed until October 29th.

[23, 24] It is true that by certain affidavits of counsel, to whose integrity and veracity we of course accord the highest respect, it appears that they had prepared and tendered and thought they had left with the judge on October 2nd a certificate covering all of the evidence in the case. Upon this latter point, however, the positive certificate of the judge is to the contrary. The affidavits referred to, made in January, 1921, after the record in this case was applied for and certified by the clerk of the lower court, show, among other things, that the statement of Mr. Byrd,

recited in the certificate No. 11, hereinbefore set out
in full, as originally dictated in the presence of the
judge on October 2nd, designated 11 instead of 10
certificates, the 11th being the certificate of the
evidence, but that before signing what is now certificate
11, the judge, at the request of counsel for appellees,
struck out the figure 11 in Mr. Byrd's statement and
made it read "certificates 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10,"
as shown above.    This occurrence corroborates Mr.
Byrd's recollection and belief that he left the certificate
in question with Judge Brent on the 2nd of October,
but it also shows that the judge did not agree with
him upon that point.    And the certificate No. 12
signed on the 29th of October, set out below, is even
more emphatic in this particular.    We cannot in this
collateral proceeding decide a disputed question of
fact between court and counsel, but must accept the
certificate of the trial court as final.    Only in cases
where the undisputed facts show that appellants have
done all they were required to do, and would therefore
be entitled to a mandamus, can we apply the rule
announced in the *Conaway* and *Lancaster Cases, supra,*
and treat irregular bills or certificates of exception as
parts of the record without any direct proceeding for
that purpose.

The only certificate before us which undertakes to
certify all of the evidence was signed on the 29th day
of October, 1920, and is as follows:

"The following evidence on behalf of proponents
and of the contestants as hereinafter noted is all the
evidence that was introduced on the trial of this cause
(here insert stenographic report of the trial of said mat-
ter beginning July 19, 1920, and ending August 5, 1920,
as taken by Smith & Hules, stenographers, consisting
of thirteen volumes, numbered two to fourteen, in-

clusive, beginning with page 33 and concluding 2431, both inclusive, and identified by my initials on the first and last sheet of each volume) except that the original checks, notes, etc., identified by the witness Ratcliffe and listed by his stenographer as exhibits fifty-four to —— were introduced in evidence and are not shown in their entirety by said transcript, and the same is true of the telephone slips identified by the witness, Mary E. Pope.

"It is further certified that the foregoing thirteen volumes of said evidence were produced before me at my office at Alexandria, Virginia, on October 2, 1920, by Mr. R. E. Byrd, of counsel for contestants, at the same time that he presented to me the eleven certificates heretofore signed by me on October 16, 1920, as of October 2, 1920, after correction; but there was no certificate presented to me at that time or thereafter in connection therewith, and I was not requested by Mr. Byrd or anyone else to certify the evidence in this case until I was requested to do so on October 26, 1920, by Mr. Lion, of counsel for contestants, and no certificate was actually presented to me in connection therewith until to-day, which I have this day signed after amending the same to show the facts as herein stated.

"I further certify that on October 2, 1920, Mr. Byrd, when he left my office, took with him all of said volumes of evidence except volume fourteen, which contains the instructions he then asked to have certified, though he then offered to leave all of said volumes with me, which I told him was unnecessary, and said volumes two to thirteen, inclusive, were not again presented to me until October 26, 1920, when Mr. Lion again presented them to me as aforesaid, and Mr. Lion now states that he then had in his possession a

certificate to be signed by me on that day, October 26, 1920, but he did not present the same to me.

"Teste: This 29th day of October, 1920, but done over the protest of counsel for proponents.

"Sam'l G. Brent, judge."

[25] This positive certificate by the judge of the trial court leaves us wholly without jurisdiction to consider the exceptions signed by him on the 29th of October. See *Bragg* v. *Justis*, 129 Va. 354, 357, 106 S. E. 335. This being true, and all the other exceptions being necessarily dependent for their materiality upon a consideration of the evidence, the appeal must be dismissed. *Colbert* v. *Callaham & Sons*, *supra*. It is not a matter of discretion or choice, but a question of power which confronts us in this case. In the state of the record before us, we have no more jurisdiction to consider the evidence appearing in certificate No. 12 than we would have if it had never been presented to or signed by the judge at all. *Bragg* v. *Justis*, *supra; Kelly* v. *Trehy*, *supra*.

The writ of error is dismissed as having been improvidently awarded.

*Dismissed.*